# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| FREDDIE HIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-3128 |
| | ) | |
| CYNTHIA MORENO and | ) | |
| KIM PECK, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

This matter comes before the Court on Defendants Cynthia Moreno and Kim Peck's Motion for Summary Judgment (d/e 22). For the reasons stated below, the Motion for Summary Judgment is GRANTED.

1

# FACTS[1]

A. Background Facts and Events Leading to Plaintiff's Termination

Plaintiff was employed by DCFS as the Northern Regional Education Transition Coordinator in the Office of Education Transition Services. Peck supervised Plaintiff and Moreno supervised Peck.

Between December 2001 and January 2005, Peck's evaluations of Plaintiff's job performance stated his work was "accomplished". Between December 31, 2004, and January 1, 2006, she rated his performance as "acceptable". Unhappy with this lesser rating, Plaintiff entered Peck's office on February 1, 2006, and told her that he was filing a grievance against her because he was dissatisfied with the performance evaluation. Peck allegedly responded by elbowing Plaintiff in the groin.

On February 2, 2006, Plaintiff called the Peoria Police Department to report the groin incident. Charges were never filed against Peck for

_____

[1]These facts are largely derived from Defendants' Memorandum of Law. See d/e 22-1 (Defendants' "Memorandum"). Any genuinely disputed facts which are material to this case are incorporated from Plaintiff's brief. See d/e 28 (Plaintiff's "Response"). Several "facts" alleged in the parties' submissions are omitted because they are irrelevant to this suit or—as is too often the case—really arguments posing as facts.

the incident.  Peck denied that she ever elbowed Plaintiff in the groin.

Prior to the groin incident, Peck asked Plaintiff to send her a copy of a memo (a/k/a notice) concerning his monthly visits to DCFS' Northern Region field offices.  When Peck inquired with Plaintiff about why he had not sent the memo, Plaintiff claimed he had been very busy but had sent her a copy.  Peck sought to verify Plaintiff's claim by accessing his email account.  Review of Plaintiff's email showed Plaintiff had sent and received numerous personal emails via his government-issued computer and email account.  Several of those emails contained nude images.

On February 10, 2006, Peck contacted David Hoover, a labor relations specialist for DCFS, about Plaintiff's email.   Peck believed the email violated DCFS policy.  Peck turned the email over to Pete Wessel, a Labor Relations Specialist for DCFS.  Wessel drafted disciplinary charges against Plaintiff for: (1) Falsification of Information; (2) Misuse of Time and Property; and (3) Noncompliance With a Supervisory Directive.  Since Plaintiff had received a 30-day suspension in 2000 and

a 45-day suspension in 2001, the 3 new charges meant another possible addition to Plaintiff's disciplinary record.

The Falsification of Information charge was based on emails from Plaintiff dated February 9, 10, and 14, 2006. In those emails, Plaintiff told Peck he complied with her directive by sending a revised memo to the Northern Region DCFS offices. Wessel's review of the emails showed that Plaintiff had not sent the revised memo out until February 27, 2006. Wessel concluded that this conduct violated § 3.1 (Professional Conduct), § 3.10 (Code of Ethics), § 3.16 (Falsification of Records) of the DCFS Employee Handbook, and the Policy Guide (Prohibition of Falsification of Records).

The Misuse of Time and Property charge was based on Plaintiff's receipt and dissemination of personal emails via his government issued computer and email account. The emails which led to his termination are categorized as follows: (A) November 2005 to February 2006 emails containing nude images; (B) September 2004, October and November 2005, and January 2006 emails referring to Peck and Moreno as "Curly"

and "Moe"—members of the "Three Stooges"—and insinuating they had a lesbian relationship[2]; and (C) emails Peck sent to Plaintiff that Plaintiff forwarded to unauthorized employees. Wessel reviewed all of the email and concluded that Plaintiff's conduct violated § 2.1 (Daily Time), § 3.1 (Professional Conduct), § 3.10 (Code of Ethics), § 3.19 (Use of State Equipment) of the DCFS Employee Handbook, the Policy Guide, and Administrative Procedure #20 (Electronic Mail/Internet/SACWIS Search Function).

The Noncompliance With a Supervisory Directive charge was based on Plaintiff's failure to email his coworkers copies of his weekly itinerary as Peck had told him to do in February 2006. Wessel found Plaintiff's noncompliance violated § 3.1 (Professional Conduct) of the DCFS Employee Handbook and Policy Guide.

Wessel determined that the charges warranted dismissal. He and

---

[2] In one email from Plaintiff, Plaintiff stated: "I don't know what kind of relationship and with whom [Peck] has, but if she had one with a male, something very negative must have occurred. She gets along too well with C. Moreno and the other one that makes me think something just isn't right. Get my meaning?" Regarding his emails which refer to Peck and Moreno as "Curly" and "Moe of the "Three Stooges", Plaintiff contends he was merely "venting" and alleges that other DCFS employees came up with the nicknames "Curly" and "Moe".

Moreno both recommended dismissal to Tom Berkshire, the labor

relations person who decided the appropriate level of discipline.  Peck

made no recommendation on the issue.  On June 13, 2006, Plaintiff was

discharged.  Plaintiff successfully challenged his termination before

Illinois' Civil Service Commission.  On February 2007, Plaintiff was

reinstated and given full back pay.

B.      The Instant Lawsuit and Related Allegations

On June 9, 2008, Plaintiff sued Peck and Moreno under 42 U.S.C.

§ 1983, claiming they fired him because he was an African American

male.  At all times relevant to his Complaint, Plaintiff was one of six

transition coordinators working under Kim Peck in the Office of

Education Transition Services.  These individuals were: Gayle Simpson

(African American female); Angela Foster (African American female); Ken

Broady (African American male), John Kasper (Caucasian male); Johnny

Williams (African American male); and Plaintiff.  Plaintiff alleged that

African American males were given directives to complete training

sessions, but they were not disciplined when the training was not

completed. Moreno and Peck allegedly gave Plaintiff, Johnny Williams, Holly Bitner-Duck, Angela Foster, and Lori Moreno a 2-3 month deadline to complete training sessions in various DCFS offices. Plaintiff and Johnny Williams completed the training sessions on time. Holly Bitner-Duck, Angela Foster, and Lori Moreno failed to meet the deadline, but they did not receive discipline. Moreover, Plaintiff alleged that Defendants gave him an unreasonably short period of time to master a software program which Johnny Williams, an African-American male, developed. However, Defendants state that training for the software program was never even sanctioned by DCFS.

Plaintiff also contends that Peck "denigrated" and "antagonized" him during various meetings in 2005. During a phone conference on December 18, 2005, Peck accused Plaintiff of being unprepared for the conference with a new service provider. A few days later, Plaintiff alleges that Peck was again "antagonistic" towards him during a meeting with the Community College Board. Again, at this meeting Peck told Plaintiff that he was unprepared.

Plaintiff further alleges that Defendants' behavior toward Pat Palmer, a Caucasian female employee, when compared with their behavior towards him and other African American employees, proves race discrimination. Pat Palmer was a personal services contract employee that reported directly to the business manager at one time, but later went to work on the Northern Illinois University (NIU) contract, which made her an employee of the University itself. Palmer later obtained her degree and became the statewide coordinator of the education and training voucher program and the community college payment program.

After Dwight Lambert retired from his position as the Central Region Transition Education Manager Coordinator, Plaintiff became responsible for certain job duties formerly required of Lambert. Some of the contract work that Lambert had been responsible for, including the Education Training Voucher Program and the Illinois Community College Board, was originally assigned to Plaintiff but then reassigned to Palmer in 2005.

Additionally, Plaintiff alleges that Pat Palmer was given time off to

complete her degree, while Plaintiff was "either obstructed from using his time or not allowed time off to attend his classes."  Plaintiff claims that "[s]omething was always scheduled to keep [him] from going to class." However, Plaintiff never told Peck that he was pursuing his doctorate degree through a university in Chicago, nor did he ever request that he be allowed to take time off work for classes.

Plaintiff also alleges that Peck hired Palmer to replace Kimberly Sims, an African American clerical worker, instead of hiring Tiffany Campbell, an African American clerical worker who had been trained to perform Sim's duties.  Plaintiff believes that Sims recommended Campbell as her replacement.  When Sims left DCFS, her position was filled by the temporary service through which she was employed.

Like Sims, Palmer was a contractual worker for DCFS and her position was under the NIU contract.  Palmer was hired by NIU based on a recommendation from Moreno and an interview done by NIU. Plaintiff suspects that Peck and Moreno made the decision to hire Palmer to fill Sims' former position.

Plaintiff further alleges that Moreno attempted to fire Ken Broady by being "instrumental in changing [Broady's] job duties to include Spanish speaking as a requirement." According to Plaintiff, Broady did not speak Spanish and was "forced to leave his position." Defendants state Moreno never fired Broady and that Broady still works for DCFS' Office of Education Transition Services.

Plaintiff also alleges that during the time that Moreno headed the Office of Education Transition Services, three African American employees of DCFS who reported to Moreno left the office. Specifically, Plaintiff claims that Dr. Sharon Latiker was forced to take a demotion, David West was terminated, and Mamie Rodger left because of the treatment she received from Moreno.

Latiker was the Associate Deputy Director of the Office of Education Transition Services and reported to Cynthia Moreno. Latiker went from being the Associate Deputy Director of the Office of Education Transition Services to a position with the Office of External Affairs. Before leaving DCFS, West had been DCFS' Associate Deputy

Director of Office Education Transition Services.  Before her departure, Rodger had been doing communications work for Moreno.  According to Plaintiff, each one of these employees' departure is relevant for showing Defendants' alleged racial and gender discrimination.

Following a prolonged discovery and briefing schedule, Defendants moved for summary judgment on Plaintiff's claim.  The matter has been fully briefed by both parties.  The Court has read the parties' submissions and issues this Opinion.

## JURISDICTION & VENUE

This Court has subject matter jurisdiction because Higgins' claims are based on federal law.  See 28 U.S.C. § 1331.  Personal jurisdiction exists because the Defendants' actions took place in Illinois.  See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (personal jurisdiction exists where a defendant "'purposefully avail[ed] itself of the privilege of conducting activities'" in the forum state) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  Venue exists because a substantial part of the events giving rise to Higgins' claims

occurred in this judicial district.  <u>See</u> 28 U.S.C. §1391(b)(2).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>see also</u>, Fed.R.Civ.P. 56(c).  A moving party must show that no reasonable fact-finder could return a verdict for the non-moving party.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 254 (1986); <u>Gleason v. Mesirow Fin., Inc.</u>, 118 F.3d 1134, 1139 (7th Cir. 1997).  Facts must be viewed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn for the non-movant.  <u>See</u> <u>Trentadue v. Redmon</u>, 619 F.3d 648, 652 (7th Cir. 2010).

## ANALYSIS

The Fourteenth Amendment's Equal Protection Clause grants all Americans "the right to be free from invidious discrimination in statutory

classifications and other governmental activity."  Harris v. McRae, 448

U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980).  A

violation of this constitutional right allows an aggrieved party to seek

redress pursuant to 42 U.S.C. § 1983.  See Nabozny v. Podlesny, 92 F.3d

446, 453 (7th Cir. 1996).

To survive summary judgment on a race discrimination claim, a

plaintiff "must either point to enough evidence, whether direct or

circumstantial, of discriminatory motivation to create a triable issue (the

'direct' method) or establish a prima facie case under the McDonnell

Douglas formula (the 'indirect' method)."  See Egonmwan v. Cook

County Sheriff's Dept., 602 F.3d 845, 849-50 (7th Cir. 2010), citing

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Irrespective

of whether a plaintiff asserts a claim under § 1983, 42 U.S.C. § 1981, or

42 U.S.C.  § 2000(e) ("Title VII"), the same requirements for proving

discrimination apply.  See Egonmwan, 602 F.3d at 850, n.7 (citations

omitted).

Here, Plaintiff does not assert any direct evidence of discrimination

13

to support his § 1983 claim.[3] Rather, he relies on the indirect method of establishing discrimination. To prove discrimination under the indirect method, a plaintiff must show: (1) he is a member of a protected class; (2) his work performance met his employer's legitimate expectations; (3) he suffered an adverse employment consequence; and (4) a similarly situated employee who was not in the protected class was treated more favorably than the plaintiff. See Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997); see also Burks v. Wisconsin Dep't of Trans., 464 F.3d 744, 750-51 (7th Cir. 2006). A rebuttable presumption of discrimination arises if a plaintiff meets this burden. See Burks, 454 F.3d at 751. However, if a defendant counters with legitimate, non-discriminatory reasons for their actions, a plaintiff then has to show that

---

[3] To establish a claim under the direct evidence method, a plaintiff "must have provided direct evidence of-or sufficient circumstantial evidence to allow an inference of-intentional racial discrimination by [the defendant]." Montgomery v. American Airlines, Inc., 626 F.3d 382, 393 (7th Cir. 2010), quoting Coffman v. Indianapolis Fire Dept., 578 F.3d 559, 563 (7th Cir. 2009). Direct evidence consists of either an "outright admission by the decisionmaker that the challenged action was undertaken because of the appellant's race" or a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." Davis v. Con-Way Transp. Central Express, Inc., 368 F.3d 776, 783 (7th Cir. 2004) (internal quotations and citations omitted).

the defendant's reasons are pretextual.  Id.

Plaintiff—an African American male—is indisputably a member of a protected class.  His 2006 termination is a materially adverse employment action, notwithstanding the fact he was reinstated with full back pay in February 2007.  See Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (finding retaliation even where plaintiff received back pay since plaintiff and family  "had to live for 37 days without income" and lack of income causes injury).  Accordingly, the first and third elements of the McDonnell Douglas test are unchallenged.[4]  The Defendants contest the

---

[4]  In addition to his temporary loss of pay, Plaintiff complains that he was micro-managed, demeaned, spoken down to, questioned as to his abilities, harassed concerning his whereabouts, and struck in the groin.  These things are not adverse employment actions.  The Seventh Circuit has long held that an adverse employment action is one that is materially adverse, "meaning more than a mere inconvenience or an alteration of job responsibilities."  Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir.1993)); Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)("[N]ot everything that makes an employee unhappy is an actionable adverse action.").  Thus, while Plaintiff alleges he was chided, "micro-managed", "demean[ed] and [spoken] down to", and struck in the groin, such things are not actionable.  See, i.e., Schmidt v. Can. Nat'l Ry. Corp., 232 Fed.Appx. 57 (7th Cir. 2007) (finding plaintiff's claims that his boss or others refused to resolve a work vehicle issue, forced him to sign a list of on-call employees, failed to send him one open-position notification, made him stay late before one holiday weekend when others were permitted to leave early, and struck him on the back with a hand was not materially adverse for purposes of Title VII).

second and fourth elements of the <u>McDonnell Douglas</u> test—i.e. whether

Plaintiff met DCFS' legitimate employment expectations and whether a

similarly situated employee from outside Plaintiff's protected class

received better treatment.

## A.    Plaintiff's Job Performance Did Not Meet DCFS' Legitimate Expectations.

In February 2006, Peck discovered that Plaintiff's DCFS email

account contained nude images and other inappropriate content.  Peck

contacted DCFS Labor Relations Specialist Pete Wessel and Wessel

drafted disciplinary charges against Plaintiff for: (1) Falsification of

Information; (2) Misuse of Time and Property; and (3) Noncompliance

With a Supervisory Directive.

The Falsification of Information charge was based on Plaintiff's

February 9, 10, and 14, 2006, emails.  In those emails, Plaintiff told Peck

he had complied with her directive by sending a revised memo to the

Northern Region DCFS offices.  Review of Plaintiff's emails showed that

he had not sent the revised memo out until February 27, 2006.  Wessel

concluded that Plaintiff's conduct violated § 3.1 (Professional Conduct),

§ 3.10 (Code of Ethics), § 3.16 (Falsification of Records) of the DCFS Employee Handbook and Policy Guide (Prohibition of Falsification of Records).

The Misuse of Time and Property charge was based on Plaintiff's receipt and dissemination of personal emails via his government issued computer and email account. The emails which led to his termination are categorized as follows: (A) November 2005 to February 2006 emails containing nude images; (B) September 2004, October and November 2005, and January 2006 emails referring to Peck and Moreno as "Curly" and "Moe"—members of the "Three Stooges"—and insinuating they had a lesbian relationship[5]; and (C) emails Peck sent to Plaintiff that Plaintiff forwarded to unauthorized employees. Wessel reviewed all of the email

---

[5] As noted earlier, Plaintiff stated in one email: "I don't know what kind of relationship and with whom [Peck] has, but if she had one with a male, something very negative must have occurred. She gets along too well with C. Moreno and the other one that makes me think something just isn't right. Get my meaning?". Such comments had no business purpose and were, therefore, inappropriate for an office email. As for his emails referring to Peck and Moreno as "Curly" and "Moe of the "Three Stooges", Plaintiff contends he was merely "venting". He also says he cannot be disciplined for using those nicknames since other DCFS employees had given them to Peck and Moreno and Plaintiff merely repeated the nicknames. Who gave the Defendants those nicknames is irrelevant. By repeating them in an email, Plaintiff was insubordinate.

and concluded that Plaintiff's conduct violated § 2.1 (Daily Time), § 3.1 (Professional Conduct), § 3.10 (Code of Ethics), § 3.19 (Use of State Equipment) of the DCFS Employee Handbook, and Administrative Procedure #20 (Electronic Mail/Internet/SACWIS Search Function).

The Noncompliance With a Supervisory Directive charge was based on Plaintiff's failure to email his coworkers copies of his weekly itinerary as Peck had told him to do in February 2006. Wessel found Plaintiff's noncompliance violated § 3.1 (Professional Conduct) of the DCFS Employee Handbook and Policy Guide.

The charges discussed above—Falsification of Information, Misuse of Time and Property, and Noncompliance With a Supervisory Directive—are proof that Plaintiff's job performance did not meet Defendants' or DCFS' legitimate expectations. Plaintiff tries to show the adequacy of his work by offering his performance evaluations, affidavit, and the affidavits of coworkers. His offerings are insufficient to survive summary judgment.

While performance evaluations can be relevant in some

circumstances, they "cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." See Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998). The critical inquiry is a plaintiff's "performance at the time of [his termination]." See Moser v. Indiana Dep't of Corr., 406 F.3d 895, 901 (7th Cir. 2005) (holding that prior positive evaluations did not demonstrate that the employee was performing adequately at the time of her adverse employment action).

As of January 1, 2005—the date of Plaintiff's last performance evaluation prior to his June 13, 2006, termination, Plaintiff's performance evaluations show that his work was "accomplished" and "acceptable". Although Plaintiff had a commendable evaluation on January 1, 2005, emails discovered after that date demonstrated his noncompliance with directives, falsification of information, general insubordination, and misuse of government resources. That misconduct comprised the relevant period for assessing Plaintiff's performance and shows he did not meet expectations.

Plaintiff tries to explain away his email problem by contending that while he received personal emails at work and opened them there, he sent those emails to his home account without absorbing work hours to review them. Plaintiff also states that he only received the emails because he gave his business card to a friend and that friend sent him the unsolicited emails.

Plaintiff's explanation overlooks the fact that he had no business purpose for providing a business card to a person with whom he had no business relationship. Disseminating the card to such a person effectively invited personal emails on Plaintiff's state-issued computer and on his state email account. As easily as Plaintiff gave out his business card, Plaintiff could have provided a personal email address instead. The act of providing a business email address to a non-business associate invited personal contact via government resources, and Plaintiff must bear all the consequences.

More pointedly, by forwarding personal emails from his work computer to his personal email account, Plaintiff necessarily used his

state-issued computer and state-issued email account for personal matters.   Furthermore, by stating that he knew the emails were personal and that he nevertheless opened one email and received and forwarded numerous others via his state-issued computer and email account, Plaintiff admits using government resources for personal matters.

Plaintiff fares no better by offering affidavits from himself and coworkers Johnny Williams and John Kasper to show that email violations were commonplace.  While the affiants allege that they and other employees received no discipline despite conducting personal correspondences on government-issued computers, proof that others also violated DCFS' prohibition on personal emails does nothing to prove  the adequacy of Plaintiff's work.[6]  By sending and receiving personal emails during work hours on a government-issued computer, Plaintiff violated

---

[6]    Insofar as Williams and Kasper aver that Plaintiff was a good employee, "general averments of co-workers, indicating a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting [his] employer's legitimate expectations at the time [he] was terminated.  See Peele, 288 F.3d at 329 (7th Cir. 2002); see also, Herron v. DaimlerChrysler Corp., 388 F.3d 293, 300 (7th Cir. 2004)("that plaintiff's coworkers 'may have thought that [she] did a good job . . . is close to irrelevant' ") (quoting DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)).

DCFS' Employee Handbook and Policy Guide's § 2.1 (Daily Time), § 3.1 (Professional Conduct), § 3.10 (Code of Ethics), § 3.19 (Use of State Equipment) and, in doing so, did not meet DCFS' legitimate expectations.

**B.  No Similarly Situated Employee Outside Plaintiff's Protected Class Was Treated Better Than Plaintiff.**

To show that an individual is similarly situated to himself, a plaintiff must establish that the individual is "directly comparable to [him] in all material respects.  See Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002).  To present a "similarly situated co-worker", a plaintiff need not produce a "clone".  See Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 916 (7th Cir. 2010).  However, in disciplinary cases, a plaintiff must show that the allegedly similar "employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  See Peele v. Country Mut. Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002) (quoting Radue v.

Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)). The

Seventh Circuit has specifically cautioned that in order to establish a

coworker as "similarly situated", the coworker must be shown to have a

"comparable set of failings." See Haywood v. Lucent Techs., 323 F.3d

524, 529 (7th Cir. 2003).

In his Response, Plaintiff names only Collins and Kasper as persons

similarly situated to himself. See Response at 31-34. Various affidavits

attached to the Response reference other employees. However, since the

affidavits do not provide any details establishing that those employees

had a set of failures comparable to Plaintiff's, the affidavits do not show

that those other employees were similarly situated to Plaintiff. See

Haywood, 323 F.3d at 529.[7]

Accordingly, consideration of the "similarly situated" issue is

limited to Collins and Kapser, the two white employees Plaintiff alleges

---

[7] Moreover, providing an affidavit is not a substitute for actually making an argument within a brief. See DeSilva v. DiLeonardi, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."). If an argument is not made in a brief, the Court will not reach into a brief's attachments, etc. to make a case for a party on summary judgment. See United States v. 5443 Suffield Terrace, Skokie, Ill., 607 F.3d 504, 510 (7th Cir. 2010). Counsel should note this with respect to all future briefing.

to be similarly situated to himself with respect to email violations.  See
Response at 31-34.  Collins is a female clerical worker, and John Kasper
is a male who was Higgins' counterpart in DCFS' Chicago office.  Collins
received an oral reprimand for using her government-issued computer
and email account to send personal correspondence.  However, no record
shows either that Defendant supervised Collins or that Collins ever
violated another DCFS policy prior to her email transgression.
Therefore, when DCFS discovered Collins' violation, DCFS issued her
only an oral reprimand.

 As for Kasper, there is no indication that DCFS ever knew Kasper
violated DCFS' email policy.  Not until Kasper signed an affidavit in this
case—wherein he admitted sending and receiving personal emails—did
Kasper's violations become known.  Since DCFS did not know about
Kasper's violations, DCFS could not have disciplined him.  Furthermore,
like Collins, nothing shows that Kasper ever violated a DCFS policy prior
to his email transgression.

 Also, as distinguished from Collins and Kasper, Plaintiff had a

history of disciplinary violations, including 30-day and 45-day suspensions. He sent and received nude images on his computer and email account whereas Collins and Kasper never did so. Additionally, unlike Collins and Kasper, Plaintiff was insubordinate to Peck and Moreno via his emails and noncompliant with directives. Accordingly, Collins and Kasper do not have a set of failures comparable to Plaintiff's and are not similarly situated to him. See Radue, 219 F.3d 617-18; Haywood, 323 F.3d at 529. Because Plaintiff cannot established this element, he cannot succeed on his claim. See Haywood, 323 F.3d at 529.

## C.    Plaintiff Has Not Shown Pretext.

The pretext issue need not be addressed since Plaintiff failed to establish a prima facie case of discrimination. See Burks, 464 F.3d at 754, citing Haywood, 323 F.3d at 531. Nevertheless, for the sake of being comprehensive, this Court will address the issue.

By proffering Plaintiff's Falsification of Information, Misuse of Time and Property, and Noncompliance With a Supervisory Directive,

Defendants have shown non-discriminatory reasons to support Plaintiff's firing. Because those non-discriminatory reasons have been proffered, the burden shifts to Plaintiff to show that each of Defendants' proffered reasons is a "lie". See Burks, 464 F.3d at 754 (citation omitted). Unless Plaintiff has evidence that Defendants did not believe their own proffered reasons for his termination, he cannot defeat their summary judgment motion. See Andreani v. First Colonial Bankshares Corp., 154 F.3d 389, 397 (7th Cir. 1998)(a defendant is entitled to summary judgment when a plaintiff fails to rebut a defendant's proffered reason for an adverse employment action).

The only thing Plaintiff contests as "pretext" is Defendants' reliance on his 2000 and 2001 infractions as a basis for discharge. As such, all other grounds proffered by Defendants are uncontested grounds, sufficient in themselves to warrant summary judgment. See Burks, 464 F.3d at 754; Andreani, 154 F.3d at 397. Turning then to the 2000 and 2001 infractions, Plaintiff argues that the infractions are too distant for Defendants to have truthfully relied on them for his termination.

Plaintiff offers no authority for this argument, and the Court has found no cases in support thereof. Therefore, the Court rejects Plaintiff's assertion that infractions cannot be relied on as grounds for discipline simply because the infractions are old.

Having found that Plaintiff failed to prove a prima facie case of discrimination or pretext, the Court does not reach any remaining issue. Defendants are entitled to summary judgment.

## CONCLUSION

THEREFORE, Defendants Kim Peck and Cynthia Moreno's Motion for Summary Judgment (d/e 22) is GRANTED. This case is CLOSED.

IT IS SO ORDERED.

DATED:   June 14, 2011

ENTERED BY:                              s/ Sue E. Myerscough
                                   SUE E. MYERSOUGH
                                   U.S. DISTRICT JUDGE